JUSTIN A. and BARBARA McNAMARA, Petitioners v.. COMMISSIONER OF INTERNAL REVENUE, Respondent.
McNamara v. Commissioner
Docket Nos. 2576-70 8018-70
United States Tax Court
T.C. Memo 1973-3; 1973 Tax Ct. Memo LEXIS 283; 32 T.C.M. (CCH) 11; T.C.M. (RIA) 73003; January 4, 1973, Filed Sheldon S. Baker, for the petitioners. Allan Hill, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the taxable years 1965, 1966, 1967, and 1968 in the following amounts: Year
Deficiency
1965
$2,007.29
1966
306.62
1967
1,647.22
1968
2,923.60 2 The issues for our decision are: 1. Whether petitioners are entitled to deductions for charitable contributions because of their grant of the use of their boat to exempt organizations during the taxable *285 years 1965, 1967, and 1968. 2. Whether amounts petitioners expended in connection with their boat during 1965 were incurred in a trade or business or in a transaction entered into for profit; and 3. Whether petitioners sustained either a deductible ordinary loss or capital loss upon the sale of their boat in 1965. FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. Petitioners, Justin A. McNamara and Barbara McNamara, are husband and wife who at the time of the filing of their petitions herein resided in San Pedro, California. The petitioners filed joint Federal income tax returns for the taxable years 1965, 1966, 1967, and 1968 with the district director of internal revenue, Los Angeles, California. Petitioner Justin A. McNamara, hereinafter referred to as petitioner, was employed by American Airlines as a commercial airline pilot during the taxable years in issue. It is the policy of American Airlines to require its pilots to submit to three medical examinations each year. Should such a medical examination reveal a disability or evidence of serious illness, American Airlines will refuse to allow that person to continue serving as *286 its pilot. 3 Prior to his employment by American Airlines in 1953, petitioner served in the Air Force from 1948 to 1953 and served in the Merchant Marine from 1944 until 1948. While serving in the Merchant Marine petitioner received a license as a third mate and then a license as a second mate. Petitioner's license as second mate entitled him to serve as second mate on any vessel in any waters and to serve as skipper on any vessel of 100 tons or less carrying any number of passengers. Petitioner's second mate license expired in 1953. Petitioner's first assignment with American Airlines was flying out of Dallas. In 1957 petitioner was transferred to Los Angeles by American Airlines and he immediately began attending the necessary schools and passing the required examinations to reacquire a second mate's license and did reacquire such license. In the late 1950's petitioner decided to have a boat built of a type usable to take out parties of six or less for sport fishing. He purchased plans for building such a boat for $600 and he then purchased a diesel engine for the vessel. A boatbuilder was hired to build the boat and construction began in 1960. The vessel was put in *287 the water in 1962 although construction was not complete and at that time was registered with the Coast Guard. The Coast Guard documented the vessel, named the Mara, as properly authorized to be used in "The Coasting trade and mackerel fishery." Construction on the Mara was completed in February or March of 1965. About the time the Mara was completed, petitioner placed one advertisement in a San Pedro, California newspaper, stating that the 4 boat was for hire and told a yacht broker at the anchorage where the Mara was located that the Mara was available for hire. The advertisement cost petitioner $5 and was carried in the paper for 3 days. Petitioner inquired of a professional skipper whether he would be interested in piloting the Mara for charter parties if petitioner's duties with the American Airlines made it impossible for him to skipper the boat. When this professional skipper evidenced an interest in piloting the Mara for petitioner, petitioner took this skipper and his wife out for a several days cruise on the Mara two or three times. This professional skipper had knowledge of the best fishing places and the proper lures to use for certain types of fishing. Petitioner *288 was not knowledgeable in these respects in 1965. Petitioner also obtained in 1965 a business license to operate the Mara as a commercial sports venture. The Mara's length was 36 feet and its width, 12 feet, 9 inches. It weighed 14 tons, was of wood construction and had a flying bridge. It was equipped with dual controls, a galley with gas stove, ice box, and a sink, a head, ship-to-shore radio, auto pilot, and an electric windlass to lift the anchor. The engine was a 4-cycle 225 horsepower General Motors diesel engine. The interior of the boat had carpeting and draperies and there were nylon covers on the bunks. In 1965, neither petitioner nor any professional skipper took any paying customers out on the Mara. Prior to completion of the Mara, petitioner had taken it on cruises to Catalina for his personal 5 pleasure. After the Mara was completed in 1965, petitioner used the boat four or five times for personal pleasure. It is necessary that a boat be used to keep the engine from deteriorating. In the early part of 1965, petitioner was approached by a George Holton who wanted to purchase or lease the Mara in order to transport school children to and from a school *289 on Catalina Island. Upon being told by petitioner that the charter price of the Mara was $125 per day for the summer months, Holton inquired whether petitioner would be willing to donate the use of the boat to the school. When Holton's organization, The Wilderness Foundation, received notice that it was a charitable organization qualified as an educational organization under section 170(c), I.R.C. of 1954, petitioner agreed to donate the use of the boat to the organization. Petitioner permitted the wilderness Foundation the rent-free use of the Mara for a 39-day period of time covering the months of July and August 1965. During this 39-day period, the Wilderness Foundation had exclusive use of the Mara. Petitioner paid the expenses of taxes and insurance on the Mara during the 39-day period the foundation was using the Mara. Just prior to the beginning of this 39-day period of time, petitioner had completed having the underpart and the sides of the Mara painted. In December 1965 petitioner was transferred by American Airlines to Washington, D.C. Petitioner anticipated remaining in the Washington area for at least 5 years and accordingly he sold the *290 Mara on September 15, 1965 to a C. M. Johnson, taking a $400 downpayment and a note for 6 the balance. [1] In 1966 American Airlines expanded its operations and petitioner arranged to be transferred back to Los Angeles in 1967. Petitioner agreed with Johnson, the purchaser of the Mara, to foreclose on the loan and retake possession of the vessel. When petitioner sold the Mara to C. M. Johnson in 1965, the latter did not have the qualifications to operate the boat commercially. Accordingly, the boat was registered as a pleasure craft. When petitioner took possession after foreclosure, he did not take the required steps to have the Mara reregistered as a commercial vessel and it remained registered as a pleasure craft until it was sold by petitioner in 1969. During 1967, a Professor Norris from the University of California representing the Oceanic Foundation of Oahu, Hawaii, approached petitioner *291 with respect to use of the Mara to tow a small research submarine or observation chamber from Honolulu, Hawaii to the California shore. When petitioner informed Norris that the charter rate of the Mara was $125 per day, Norris stated to petitioner that the Navy would pay for any charter of a boat, but if petitioner donated the boat rent-free to the Foundation the money could be used for other 7 purposes. During the taxable year 1967, petitioner allowed the Oceanic Foundation the rent-free use of the Mara from December 1, 1967, to December 31, 1967. During the taxable year 1968, petitioner allowed the Oceanic Foundation the rent-free use of the Mara for 70 days from January 1, 1968, to March 10, 1968. During the period in which the Oceanic Foundation used the Mara, petitioner paid the expenses of mooring, taxes, and insurance. During the taxable year 1965, petitioner expended a total of $1,108 in connection with the Mara and incurred depreciation in the amount of $861.59 in connection with the Mara. Petitioners on their 1965 Federal income tax return claimed a deduction for charitable contributions in the amount of $4,875, as the rental value of the Mara for the period *292 of time the boat was used by the Wilderness Foundation. On their Federal income tax returns for 1967 and 1968, petitioners claimed deductions for charitable contributions in the amounts of $3,875 and $8,750, respectively, as the rental value of the Mara for the periods of time the boat was used by the Oceanic Foundation in each of these taxable years. On their return for the taxable year 1965, petitioners claimed as a deductible business expense and as depreciation attributable to the operation of the Mara the amount of $1,970.29. On their return for the taxable year 1965 petitioners reported a capital loss of $6,583.87 from the sale of the Mara. Petitioners claimed a capital loss deduction of $1,000 for each of the taxable years 1965, 1966, and 1967 as a result of the claimed loss incurred from the sale of the Mara in 1965. 8 Respondent in his notices of deficiency disallowed petitioners' claimed charitable deductions for donation of use of the Mara for each of the years 1965, 1967, and 1968.He also disallowed petitioners' claimed deductions for business expenses and depreciation on the Mara for 1965 and the claimed capital loss deduction for loss on the sale of the Mara *293 in 1965 and the claimed capital loss carryovers to 1966 and 1967. OPINION
Petitioners contend that they are entitled to deduct as charitable contributions the fair rental value of the Mara for the period in which the vessel was being used by the Wilderness Foundation in 1965 and the periods it was being used by the Oceanic Foundation in 1967 and 1968. Petitioners contend that the fair rental value of the Mara at the time the Wilderness Foundation used the Mara was $4,875 for the period of time it was used. Petitioners also contend that the fair rental value of the Mara for the 31 days in 1967 in which the Oceanic Foundation had use of the Mara was $3,875. Even though petitioners on their return claimed only a charitable contribution of $8,750 for use by the Oceanic Foundation of the Mara in 1968 for 70 days, in their brief they claimed they are entitled to deduct the fair rental value of the Mara for 92 days which they contend is $11,500. They assert that the Oceanic Foundation had use of the Mara in 1968 for 92 days and not merely 70 days. 9 Respondent contends that petitioners did not convey to either the Wilderness Foundation or the Oceanic Foundation a legally enforceable *294 present interest in property and therefore they are not entitled to any deductions for charitable contributions by reason of the use of the Mara by the Wilderness Foundation in 1965 and the Oceanic Foundation in 1967 and 1968. Alternatively, respondent contends that petitioners have not established the fair rental value of the Mara during the periods in which the two foundations used the vessel and have therefore failed in their burden of proof. Respondent, in support of his contention that petitioners did not convey to the charities a present interest in property, relies principally upon his Rev. Rul. 70-477, 1970-2 C.B. 62, and Orr v.. United States, 343 F. 2d 553 (C.A. 5, 1965), affirming 226 F. Supp. 809 (M.D. Ala. 1963). In Orr, the Court held that a taxpayer could not deduct as a charitable contribution the fair rental value of his automobile and airplane for the length of time he used them in doing volunteer work for a charitable organization. The Court, after distinguishing several cases, stated that (343 F. 2d at 555): Here, however, the vehicles remained under the taxpayer's control at all times. In the circumstances *295 of this case the taxpayer's theory of a gift of their proportionate use in terms of rental value is an untenable fiction. Since the Church had neither control nor possession of the airplane and automobile, we cannot hold that, for purposes of a charitable deduction, the Church was using the taxpayer's vehicles. In John G. Allen, 57 T.C. 12, 13 (1971), we stated that, "a charitable deduction based on the value of rent-free use of property granted to an exempt organization is allowable if the charitable gift 10 results in a legally enforceable conveyance of a present interest under local law." We further stated (at p. 15) that: A deduction is allowed under section 170 when a donor has relinquished control of a property interest and conveyed it to a charitable organization to be used exclusively by the organization for its charitable purposes. Petitioner contends that the facts show that he did relinquish control over the Mara during the periods in which the vessel was used by the Wilderness Foundation and the Oceanic Foundation and that therefore he is entitled to deduct *296 as a charitable contribution the fair rental value of the Mara during these periods. In our view the evidence supports petitioner's contention. We conclude that each of the charitable organizations did in fact exercise exclusive control over the Mara during the periods of time it had use of the Mara. Thus, Orr v.. United States, supra, is not applicable to the factual situation in this case. We hold on the facts here present that petitioner made a completed gift of a present interest in property to the charitable organizations which was legally enforceable by the donee against the donor under the laws of the State of California. Calif. Civil Code Sections 1146, 1147, and 1148 (West 1954); Soberanes v.. Soberanes, 97 Cal. 140, 31 P. 910, 912 (1893). 11 Respondent's alternative contention is that petitioners have failed to establish the fair rental value of the Mara. Petitioner relies upon his own testimony as an expert in the yacht rental business and the testimony of a full-time yacht broker whom he called as an expert witness. The yacht broker appraised the fair rental value of the Mara for the period in which it was used by the Wilderness *297 Foundation in the summer of 1965 to be $2,500. He further appraised the fair rental value of the Mara for the period in which it was used by the Oceanic Foundation at the end of 1967 and the beginning of 1968 to be $75 per day. Petitioner himself appraised the fair rental value of the Mara to be $4,875 for the period in 1965, and $125 per day for the periods in 1967 and 1968. The Yacht broker based his appraisal of the fair rental value of the Mara upon factors such as size and features of the vessel, age of the vessel, time of year, the proposed use of the vessel, and the length of time the vessel is to be rented. We are convinced by the testimony of the yacht broker that he does have a thorough knowledge of the yacht rental business in the Los Angeles area.
On brief, petitioner has asserted that his expert witness erred in placing a rental value of $2,500 for the 39-day period in 1965 in which the Wilderness Foundation used the Mara. Petitioner contends that the daily charter rate of $130 should not be discounted to any amount less than $125 per day even though the charter is for a 39-day period. We have considered the testimony of the yacht broker along with all the other *298 evidence of record and accept his opinion that the 12 fair rental value of the Mara for the 39-day period it was used by the Wilderness Foundation in 1965 is $2,500. With respect to the periods during 1967 and 1968 when the Oceanic Foundation had use of the Mara, petitioner placed a valuation of $125 per day on the boat whereas his expert witness, the yacht broker, placed a value of $75 per day on the boat. Petitioner supports his own valuation by a contention that the Oceanic Foundation was willing to pay him $125 per day to secure the use of his vessel. In our view the record does not support petitioner's contention that the Oceanic Foundation was willing to pay petitioner $125 a day for the use of the Mara. Petitioner testified that when he told Norris that the Mara "went for" $125 a day, Norris said, "well, the Navy pays for it. If you want me to pay $125 a day, all right. If you want to donate it, I will appreciate it. I will use the money elsewhere." In our view this testimony of petitioner falls far short of supporting his contention that the Oceanic Foundation was willing to pay $125 a day for use of the Mara. There is no indication in the record that Norris would *299 not negotiate the price with petitioner if petitioner had not agreed to donate the use of the Mara to the Oceanic Foundation. We have considered all the evidence of record affecting the fair rental value of the Mara in the winter of 1967-1968 and accept the testimony of petitioner's expert that the fair rental value of the Mara was $75 per day in December 1967 and January through March 1968. 13 Petitioners contend that the Oceanic Foundation had possession of the Mara from December 1, 1967 until March 31, 1968, whereas on their joint income tax return for the taxable year 1968 they stated that the Oceanic Foundation had possession and use of the boat only until March 10, 1968. Petitioner claims that he signed his return without examining it after it was prepared by another person and that the return is in error. Although a taxpayer is not bound by the amount of a deduction claimed in his original return, this record lacks sufficient evidence to show that the Oceanic Foundation had use of the Mara in 1968 for more than the 70 days that the parties stipulated the Foundation had use of the boat.We conclude from the evidence that the Oceanic Foundation did not use the Mara in *300 1968 beyond the 10th of March. Accordingly, we find that petitioners are entitled to deduct the amount of $2,500 as a charitable contribution in the taxable year 1965 representing the fair rental value of the Mara for the period in which it was used by the Wilderness Foundation and the amount of $2,325 and the amount of $5,250 as charitable contributions in the taxable years 1967 and 1968, respectively, representing the fair rental value of the Mara when it was used by the Oceanic Foundation. Respondent contends that petitioner is not entitled to deduct any business expenses under section 162(a) in connection with the Mara because petitioner was not engaged in a for-profit-enterprise. Respondent points out that petitioner not only made no profit in any 14 year from 1962 through 1965 from the operation of the Mara, but did not receive any gross receipts from the operation of the Mara in any of these years. Petitioner points out that during the years prior to 1965, the Mara was still under construction. Whether or not petitioner was engaged in a trade or business depends in part *301 upon whether the enterprise was "entered into, in good faith, with the dominant hope and intent of realizing a profit * * * therefrom." Hirsch v. Commissioner, 315 F. 2d 731, 736 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. In our view petitioner was not engaged in the year 1965 in the "carrying on of any trade or business" within the the meaning of section 162(a) in connection with the Mara. In the year 1965 petitioner's boat was completed in the early spring. The only actions taken by petitioner after that date included talking with a professional skipper as to his availability to pilot the Mara if and when the boat was chartered, placing one 3-day advertisement in a local newspaper that the Mara was available for charter, and telling the operator of the yacht basin where the boat was anchored that the boat was available for charters. However, at the peak of the charter season petitioner allowed a nonprofit organization the free use of his boat for over 30 days and then shortly thereafter sold the boat. The testimony offered by petitioner to support his evaluation of the fair rental value of the Mara in the summer of 1965 clearly indicates that *302 with a little effort a boat of the type of the Mara could be chartered. 15 The only clue as to why petitioner had not chartered the boat is in his testimony that he was not in 1965 familiar with the best fishing spots and best lines to use for fishing. Even this testimony does not explain why petitioner did not obtain charters for the boat to be piloted by the professional skipper with whom he had talked. Had we believed that petitioner made any real effort to charter his boat in 1965 and was unable to do so, we would have concluded that the boat had no fair rental value for a charitable deduction. The only reasonable conclusion on the basis of this record is that in 1965 petitioner was not in the trade or business of operating the Mara for hire. Petitioner contends that section 1.248-1(a) (3), Income Tax Regs.[2] is authority for our finding that petitioner was engaged in a trade or business. This section of the regulations and section 248 of the 16 Code to which the regulations relate concern the right of a corporate taxpayer to amortize organizational expenses. Our attention has not been called to, nor have we found any case which holds *303 or even implies that the test set forth in section 1.248-1(a) (3) has any applicability to determining whether an enterprise in other than corporate form has actually entered into a trade or business for purposes of section 162(a). The legislative history of section 248 speaks only in terms of corporations, and not sole proprietorship, or any other business form. H. Rept. No. 1337, 83rd Cong., 2d Sess. p. A-64 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83rd Cong., 2d Sess., p. 37 (1954). However, under the facts here present petitioner has not shown that he had even established "the nature" of any chartering business for the Mara. The determination of whether an enterprise is a "trade or business" within the context of section 162 is a factual determination. William Tiffin Downs, 49 T.C. 533, 540 (1968). On the facts of this record we conclude that in 1965 petitioner was not engaged in a trade or business of chartering the Mara for hire and therefore petitioner is not entitled to deduct any depreciation of or expense on the Mara. *304 Petitioner claims in the alternative that the expenses in connection with the Mara and depreciation allowance on the Mara are deductible in the taxable year 1965 as ordinary and necessary expenses paid or incurred for the management, conservation, or maintenance of property held for the production of income under section 212. Respondent contends that the Mara was not held by petitioner for the production of income and that accordingly the expenses are not deductible. 17 In Marcell N. Rand, 34 T.C. 1146, 1150 (1960), we stated: * * * the question of whether property is held primarily for the production of income or primarily as a sport, hobby, or recreation is not determined solely from the intention of the taxpayer but rather from all the circumstances of the case. * * * In the Rand case, the taxpayer purchased in 1954 a yacht which could sleep seven. He used the yacht, named the Jamara, for pleasure in northern waters in the summer months. In the winter the boat was taken to Florida where it was listed for charter with seven well-known Florida yacht brokers. None *305 of these firms was successful in obtaining any charterer of the Jamara. The Jamara was also used by the taxpayer and his family during the winter months while being listed with yacht brokers and available for charter. We concluded that the taxpayer (34 T.C. at 1150): * * * made no definitive dedication, conversion, or appropriation of the yacht to income-producing purposes apart from pleasure. It was at all times available to him for his personal use and was so used by him whenever he so desired. Petitioner was no doubt trying to recoup some of his expenses in taking the boat to Florida in the winter and back to Connecticut in the summer. We are unable to find as an ultimate fact, after taking into consideration all the circumstances of the case, that the Jamara was held during the winter months primarily for the production of income rather than for pleasure. * * * As in Marcell N. Rand, supra, petitioner in this case made no definite dedication of the Mara to income-producing purposes. The evidence shows a distinct lack of effort to receive revenue from charter parties. At the peak of the yacht charter season, petitioner donated his yacht to a *306 charitable organization rent-free. 18 His attempts to advertise the availability of the Mara for charter parties were minimal. We conclude from the evidence as a whole that petitioner did not hold the Mara in 1965 primarily for the production of income. Accordingly, petitioner is not entitled to deduct the expenses incurred in the taxable year 1965 in connection with the Mara as expenses incurred for the production of income under section 212. Since we have concluded that the Mara was neither property used in a trade or business of petitioner or property held for the production of income by petitioner, no depreciation deduction is allowable to petitioner in the year 1965 for the Mara under section 167(a) (1) or (2). Petitioner contends that he is entitled to deduct from his 1965 income the loss he incurred upon the sale of the Mara and in the alternative that he is entitled to treat his loss on the sale of the Mara as a deductible capital loss. On his return for 1965 petitioner reported a long-term capital loss of $6,583.87 and claimed a long-term capital loss deduction of $1,000 in each of his taxable years 1965, 1966, and 1967. On brief, petitioner contends primarily *307 that he sustained an ordinary loss of $6,583.87 in 1965 which is allowable in full under the provisions of section 1231 and in the alternative that he incurred a deductible capital loss. 19 Section 165(c) limits the deduction for losses by individuals to (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and (3) casualty losses. Petitioner contends that his activities with respect to his yacht in 1965 constituted a trade or business and that section 1231 allows him to deduct the full amount of his loss in 1965 on the sale of the Mara as an ordinary loss. We reject this contention of petitioner because he was not engaged in a trade or business with respect to the Mara in 1965. We stated our reasons for this conclusion in our discussion of petitioner's contention that the expeneses incurred in 1965 with respect to the Mara were deductible under section 162(a). Those reasons are likewise support for our conclusion that petitioner's loss on the sale of the Mara was not a loss on property *308 used in a trade or business. Petitioner apparently contends that if he is not entitled to deduct his loss on the sale of the Mara under section 1231, he should be allowed to deduct this loss as a loss in a transaction entered into for profit. Petitioner contends that although he did not make a profit in 1965, the requisite intent to make a profit was present. In support of this contention he notes that the boat plans he purchased were for a craft specifically designed for charter parties, that he had contacted a professional skipper, that he ran an advertisement in a local newspaper stating that the Mara was available for 20 charter and that he told the manager of the yacht basin at which the Mara was anchored that the boat was available for charter. Although the actual realization of a profit is not necessary for a profit motive to exist, this record does not support petitioner's contention that the Mara was a "transaction entered into for profit." By allowing a charitable organization the rent-free use of the Mara during the height of the 1965 charter season, petitioner thwarted the possibility of his earning a profit from the Mara in 1965. Allowing the Wilderness Foundation *309 the use of the Mara produced a tax-reduction to petitioner in the form of a charitable contribution or deduction but a motive to effect a tax reduction is not a "profit" motive since it is not intended to produce taxable income. See Knetsch v. United States, 348 F. 2d 932, 939 (Ct. Cls., 1965), certiorari denied 383 U.S. 957 (1966). From the record as a whole, we conclude that petitioner did not enter into the transaction involving the Mara for profit. Since the Mara was property held by petitioner for personal reasons and was not property held for the production of income or for use in a trade or business, petitioner is not entitled to any deduction in 1965 as an ordinary loss or as a capital loss for his loss on the sale of the Mara and is not entitled to any capital loss carryover deduction in 1966 and 1967. Decisions will be entered under Rule 50. Footnotes
1. Petitioners showed on their 1965 income tax return that they sold the Mara to Johnson for a loss in the amount of $6,583.87. Apparently respondent does not question the amount of the loss reported by petitioners on the sale of the Mara but questions the deductibility of the loss. ↩
2. Sec. 1.248-1(a) (3), Income Tax Regs., provides as follows: * * * The determination of the date the coporation begins business presents a question of fact which must be determined in each case in light of all the circumstances of the particular case. The words "begins business," however, do not have the same meaning as "in existence." Ordinarily, a corporation begins business when it starts the business operations for which it was organized; a corporation comes into existence on the date of its incorporation. Mere organizational activities, such as the obtaining of the corporate charter, are not alone sufficient to show the beginning of business. If the activities of the corporation have advanced to the extent necessary to establish the nature of its business operations, however, it will be deemed to have begun business. For example, the acquisition of operating assets which are necessary to the type of business contemplated may constitute the beginning of business. ↩