GEORGE B. E. HAMBLETON AND JANET F. HAMBLETON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hambleton v. Commissioner
Docket No. 8467-77.
United States Tax Court
T.C. Memo 1982-234; 1982 Tax Ct. Memo LEXIS 504; 43 T.C.M. (CCH) 1257; T.C.M. (RIA) 82234; May 3, 1982. *504 Held: Petitioners' operation of a farm was not an activity engaged in for profit. Held further: The farming operation together with the holding of the farmland for its appreciation in value did not constitute a single activity engaged in for profit within the meaning of section 1.183-1(d), Income Tax Regs.Held further: The disallowed expenses are not deductible under section 212(2) as ordinary and necessary expenses incurred with respect to property held for investment. G. Robert Marcus, for the petitioners. Richard J. Sapinski, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1971
$ 2,014.00
1972
1,646.00
1973
4,538.00
1974
7,901.00
The principal issue presented for our determination is whether petitioners' operation of a farm was an activity engaged in for profit within the meaning of section 183. [1] *505 If we find that the activity was not engaged in for profit then we must decide whether certain expenses incurred by petitioners may be deducted under section 212(2) as ordinary and necessary expenses incurred with respect to property held for investment. FINDINGS OF FACT At the time of the filing of their petition, petitioners George B.E. Hambleton and Janet F. Hambleton, resided in Tewksbury Township, New Jersey. Petitioners timely filed joint Federal income tax returns for the taxable years 1971 through 1974 using the cash method of accounting. George B.E. Hambleton (hereinafter sometimes referred to as petitioner) has been employed by Pan American World Airways Inc. (Pan Am) for his entire adult working life. From May 1970 to April 1971 petitioner was Director of Route Planning (Atlantic) in New York City. In 1970 petitioners purchased Stone Valley Farm, a 110 acre tract of land in Tewksbury Township, New Jersey, for $ 230,000. A house and yard is located on one acre. Petitioners were thew owners of the subject property during the years in issue and continued to own the property as of the date of trial. The property was assessed under New Jersey's Farmland Assessment Act of 1964 (N.J.S.A. 54:4-23.1 et seq.) [2] *508 *509 *510 for at least 2 years prior to petitioners' purchase. The Act provides reduced *506 property tax assessments for land which has been actively devoted to agricultural or horticultural use for a period of 2 years prior to the year for which the farmland assessment is sought. The farmland valuation is based upon the productive capabilities of the land as opposed to its fair market value. Qualification for this favorable assessment is contingent upon the generation of a "fairly small" amount of yearly gross receipts. Property is deemed to be actively devoted to agricultural or horticultural use when the gross sales of agricultural or horticultural products, together with any soil conservation program payments, have averaged at least $ 500 per year during the previous 2 years or when there is clear evidence that anticipated yearly gross sales and soil conservation payments will total at least $ 500 within a reasonable period of time. In addition, where the land is more than five acres in area, it is deemed to be actively devoted to agricultural or horticultural use when the gross sales of such products together with any soil conservation payments have averaged at least $ 5 per acre during the previous 2 years or when there is clear evidence that anticipated yearly *507 gorss sales and soil conservation payments will be at least $ 5 per acre within a reasonable period of time. In the case of woodland and wetland all of the above provisions apply except that the minimum requirement for qualification of acreage in excess of five acres is 50 cents per acre in annual gross sales. The owners of a particular piece of property need not farm the land themselves in order for it to qualify *511 for farmland assessment. Rather, the owner may rent the property to a third party who actually farms the land and produces the required minimum annual gross receipts. The amount of annual gross receipts from the sale of agricultural or horticultural products necessary to qualify petitioners' property for valuation pursuant to the Farmland Assessment Act was $ 500 for 1971 and 1972 and $ 813 in 1973 and 1974. More specifically, petitioners needed to show that the farm had averaged these amounts of receipts for the 2 years immediately preceding the tax year in issue or show that there was clear evidence of anticipated yearly gross sales in those minimum amounts. During each of the years 1970 through 1974 petitioner applied for assessment of the Tewksbury Township property under the Farmland Assessment Act and 109 of the 110 acres were so valued for each of the years in issue. The approximate real estate tax savings due to qualification of the property under the Act is illustrated by the following table: Approximate
Assessed
Assessed
Fair
County
Value
Value
Year
Market
Equilization
as
as
Value *
Rates
Non-Farmland
Farmland
1971
$ 216,750
105.65%
$ 228,996
$ 7,900
1972
270,000
94.63%
255,500
8,500
1973
326,000
84.63%
275,894
12,500
1974
382,000
118.96%
454,427
11,000
*512 Tax Rate
Tax Savings
Per $100
Tax on
Tax on
due to
Year
of
Property
Property
Qualification
Assessed
as
as
Value
Non-Farmland
Farmland
Farmland
1971
2.800
$ 6,412
$ 221
$ 6,191
1972
2.990
7,639
254
7,385
1973
3.410
9,408
426
8,982
1974
2.500
11,361
275
11,086
Because of the rapid appreciation in the value of the land, the real estate tax savings resulting from its assessment as farmland increased each year. The total tax savings for the years at issue was approximately $ 33,644. Petitioners purchased the farm in August of 1970 and moved there in the fall of that year. Although they used approximately one acre surrounding the house for personal use, petitioners' principal motivation in purchasing the 110 acre farm was to realize a profit through appreciation in the value of the land. Additionally, both petitioners had grown up on farms and thus the prospect of operating a farm was appealing despite their inexperience in professional farm management. As the farm had been severely neglected prior to their purchase, petitioners initially mowed weeds and repaired fences *513 and buildings in an effort to restore it to operating condition. In April of 1971, Mr. Hambleton was unexpectedly transferred to Washington, D.C., by his employer, Pan Am. Petitioner moved his family to Washington in September of 1971 and purchased another house in that area. Because petitioner believed his assignment in Washington would last only a "couple of years" he opted to keep the New Jersey property and attend to it as often as possible. With the aid of free air transportation resulting from his employment, petitioner visited the farm every major holiday and virtually every weekend throughout the year except during the winter months when trips to the property were made every other weekend. In addition, his wife and children spent summer vacations at the farm. As petitioner's assignment in Washington actually lasted until 1977, this routine continued during all the years in issue. Petitioner's weekly routine was to arrive at the farm on Friday night. Petitioner would rise at 6:00 a.m. on Saturday and Sunday mornings to work on the farm and would continue laboring sometimes through the evening and into the night. Through this effort, petitioner was able to clear the land, *514 mend fences, cut hay and, in 1973, begin a cattle operation. [3] Although petitioners did not consult the county *515 agricultural agent at the time they purchased the farm or at the time they considered a breeding operation, they did seek advice from local farmers. After contacting the county agricultural agent in 1973, petitioner had soil classification tests performed on the property. Petitioners also attended several cattle meetings in an effort to obtain advice and information concerning his cattle breeding operation. Petitioners also used the property for recreational purposes. In addition to a swimming pool, petitioners maintained five Shetland ponies on the property. Petitioner's wife and three children all rode horses and their daughter rode the ponies at horse shows in the area. No cash prizes resulted from these shows and subsequently two of the ponies were sold for a very small profit. After Mr. Hambleton's transfer to Washington, D.C., in April of 1971, petitioners employed a farm manager to care for the farm during their absence. John Vilade was so employed from the fall of 1971 until early 1973. Thomas Gleason was employed as the caretaker from 1973 until the spring of 1975. Both Mr. Vilade and Mr. Gleason were employed on a full-time basis in occupations unrelated to farming. *516 It was informally agreed that 15 hours per week were to be devoted to caring for the property. In exchange, these workers received living quarters and Mr. Gleason was also allowed to keep horses on the property. In the event that the caretaker worked more than 15 hours in a particular week an hourly wage would be paid. Except during the haying season, the caretaker rarely exceeded the agreed upon number of hours of work per week. The caretaker was responsible for performing the following tasks: feeding the animals (including the ponies) and cleaning their stalls, mowing and harvesting the hay, spreading manure, cutting firewood, keeping trespassers off the property, repairing fences, cleaning the swimming pool, sweeping the patio area of petitioners' house, and general caretaking. Many of the services rendered by the caretaker improved the general appearance of the farm. Petitioners did not issue W-2 forms to these workers and no payroll records regarding their employment were kept as petitioners viewed Messrs. Vilade and Gleason as "casual laborers." Additionally, in the intial stages of the farm operation there were no separate bank accounts maintained for farm activities. *517 For the years 1970-1978 petitioners reported farm income and expenses on Schedule F as follows: Gross
Farm
Profit
Year
Income
Expenses [4]
Depreciation [5]
or Loss
1970
$ 406.65
$ (406.65)
1971
$ 683.00
$ 3,197.45
1,760.78
(4,275.23)
1972
710.00
3,303.00
1,973.00
(4,566.00)
1973
3,526.00
9,469.00
2,393.00
(8,336.00)
1974
4,049.00
7,122.00
2,676.00
(5,749.00)
1975
5,464.00
12,656.00
2,802.00
(9,994.00)
1976
5,531.00
9,457.00
2,154.00
(6,080.00)
1977
5,692.00
7,769.00
1,832.00
(3,909.00)
1978
9,251.00
6,484.00
1,420.00
[6] 1,347.00 $ (41,968.88) The items of gross income reported by petitioners on Schedule F for the years 1971-1978 are as follows: Source
1971
1972
1973
1974
Sale of Hay
$ 574
$ 595
$ 945
$ 1,120
Sale of Show
Pony
Sale of
Puppies
Sale of
Cattle
Sale of Bull
Sale of
Equipment
Rent of
Pasture
109
115
143
143
Rental Value
of Farm Apt.
and Board
of Horses
2,400
2,760
Fed. Gas Tax
Credit
38
26
Agricultural
Program
Payments
Total
$ 683
$ 710
$ 3,526
$ 4,049
Source
1975
1976
1977
1978
Sale of Hay
$ 1,290
$ 1,426
$ 987
$ 2,199
Sale of Show
Pony
325
225
Sale of
Puppies
300
Sale of
Cattle
1,000
1,905
3,694
Sale of Bull
431
Sale of
Equipment
767
Rent of
Pasture
143
200
Rental Value
of Farm Apt.
and Board
of Horses
2,760
2,880
2,800
1,960
Fed. Gas Tax
Credit
6
Agricultural
Program
Payments
640
Total
$ 5,464
$ 5,531
$ 5,692
$ 9,251
Actual *518 gross receipts for the taxable years at issue were attributable to the sale of hay and pasture rental. [7] Income entries of $ 2,400 and $ 2,760 in the years 1973 and 1974, respectively, resulted from the inclusion in income of the "fair market value of a farm apartment and board of horses" which represented the barter arrangement between petitioners and their resident caretaker. A corresponding deduction for these amounts was taken on Schedule F under the expense heading of "labor hired." The items of farm expense reported by petitioner on Schedule F for the years in issue are as follows: 1971
1972
1973
1974
Labor Hired
$ 612.50
$ 1,680
$ 3,469
$ 3,497
Repairs Maintenance
336.10
184
2,029
593
Interest
49.14
625
Feed Purchased
92.81
60
209
479
Fertilizers
110.89
192
1,128
704
Machine Hire
75.00
115
210
210
Supplies
424.31
212
745
497
Veterinarian
150.50
110
176
361
Gasoline
281.50
280
317
321
Insurance
197.00
197
197
197
Utilities
241.00
241
241
263
Tree Exp.
626.70
32
123
Total Farm Expenses
$ 3,197.45
$ 3,303
$ 9,469
$ 7,122
Depreciation
1,760.78
1,973
2,393
2,676
Total Farm
Deduction
$ 4,958.23
$ 5,276
$ 11,862
$ 9,798
Petitioners' farm is located in the northeastern *519 corner of Hunterdon County. Because of the size of the farms in that region and the topography of the land, the area does not make a significant agricultural contribution to the local economy. Moreover, the area is in the process of changing from a farm region to a residential area. The value of petitioners' property as farmland ranges between $ 150 to $ 500 per acre depending on its soil classification. In contrast, the value of the property for residential purposes is at least seven or eight times its value as farmland. In fact, Tewksbury Township is the choice residential township in Hunterdon County. It offers privacy, an excellent school system and is within a manageable commuting distance from New York City. Purchasers of property in this area are usually high income individuals who seek the real estate tax advantage of farmland assessment. Many such purchasers maintain several cows or horses on the property in an effort to qualify for the reduction in real estate taxes. Petitioners' returns for the years in issue reflect the following amounts of salary, dividend, and taxable interest income: Taxable
Year
Dividend Income [8]
Gross Wages
Interest Income
1971
$ 15,415.09
$ 22,826.21
$ 679.13
1972
15,712.00
24,102.00
4.00
1973
17,620.00
24,528.72
391.00
1974
21,344.00
25,328.68
*520 Additionally, petitioners reported the following amounts of income from the sale or exchange of capital assets: Net Capital Gain
1971
$ 36,369.58
1972
8,788.00
1973
23,831.00
1974
[9] 164,243.00
Petitioners' 1971 and 1972 returns were first audited in June of 1973. When initially asked as to the motivation for purchasing the farm property, petitioner indicated that he was raised on a farm and wanted to return to a farm environment. In September of 1973, petitioners filed an election under section 183(e) to post-pone the application of the presumption provided by section 183(d) to their farm operation. [10] *522 Section 183(d) provides that an activity is presumed to be engaged in for profit if the operation was profitable in two of the five immediately preceding years. In October of 1975 *521 an audit was begun on petitioners' 1973 and 1974 returns. After this audit petitioner prepared a chart and graph listing the farm income and expenses for all years of the farm's operation. During the years in issue, petitioner merely kept the sale and purchase receipts relating to the farm operation in a storage box. In the notice of deficiency, respondent determined that the farming activity was not engaged in for profit and, accordingly, disallowed the petitioners' claimed farm losses for the years in issue as well as investment credits taken with respect to farm property. Respondent applied all gross income reported from the activity first against interest and real estate farm taxes deducted by petitioners as itemized deductions in each of these years. As the amount of farm income generated each year was less than the interest and taxes deducted on Schedule A, none of the farm expenses reported on Schedule F were allowed to be offset against farm income. Section 183(b). The amounts of farm expenses and investment credits disallowed by the respondent are as follows: Amount of
Investment
Year
Deductions Disallowed
Credit
1971
$ 4,958
$ 37
1972
5,276
[11] 100
1973
11,862
214
1974
9,798
45
OPINION The question presented is whether the deductions disallowed by respondent relate to an activity engaged in for profit. Section 183(a)[12] *524 provides that no *523 deduction shall be allowed an individual for expenses attributable to an activity not engaged in for profit except as provided by section 183(b). Section 183(b)(1) allows deductions related to the activity which are allowable regardless of whether the activity is engaged in for profit, such as interest and taxes. Additionally, section 183(b)(2) authorizes a deduction for other expenses related to the activity to the extent that the gross income derived from the activity exceeds the deductions which are allowable irrespective of a profit motive. The term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162[13] or under paragraphs (1) or (2) of section 212. [14] *525 Since 1970, petitioners have been operating a farm on a 110 acre tract of land in Tewksbury Township, New Jersey. For the years in issue, the activity generated significant losses which petitioners deducted on Schedule F of their returns. Respondent determined that the farming operation does not constitute an activity engaged in for profit and therefore disallowed the claimed deductions in excess of these permitted under section 183(b). The test for determining whether a taxpayer is carrying on a trade or business under section 162 or is engaged in an activity for the production or collection of income or for the management, conservation, or maintenance of property for the production of income under section 212 is whether the taxpayer engaged in the activity with the predominant purpose and intention of making a profit. Allen v. Commissioner,72 T.C. 28 (1979); Dunn v. Commissioner,70 T.C. 715 (1978). Accord Golanty v. Commissioner,72 T.C. 411 (1979), *526 affd. in unpub. opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659 (1979). The taxpayer's expectation of profit need not be a reasonable one, but the taxpayer must enter into the activity, or continue the activity, with the objective of making a profit. Dreicer v. Commissioner, 78 T.C.     (April 19, 1982); Golanty v. Commissioner,supra at 425-426; Churchman v. Commissioner,68 T.C. 696 (1977); Section 1.183-2(a), Income Tax Regs.
The existence of the requisite intent is a factual question and petitioners bear the burden of proof. Boyer v. Commissioner,69 T.C. 521, 537 (1977); Benz v. Commissioner,63 T.C. 375 (1974); Rule 142(a), Tax Court Rules of Practice and Procedure.In determining whether an activity was engaged in for profit we must look to objective standards, taking into account all of the facts and circumstances.Among the relevant factors are the following: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the *527 taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation. Section 1.183-2(b), Income Tax Regs.
Petitioners purchased the New Jersey property in August of 1970. At that time Mr. Hambleton was employed by Pan Am in New York City. Initially, petitioner expended considerable effort in restoring the severely neglected farm property. In April of 1971 petitioner was unexpectedly transferred to Washington, D.C. and moved his family there is September of that year. Upon his transfer petitioner decided to retain the property and to proceed with the farm operation. Petitioner attended to the property on weekends, holidays and vacations and hired a caretaker to live on the farm and devote approximately 15 hours per week to work on the farm. This arrangement continued through the years in issue. Because it was foreseeable that petitioner's employment would keep him in Washington, D.C., for at least several years, we view the issue in this case as focusing *528 on whether at the time of Mr. Hambleton's employment transfer and for the years in issue petitioners continued the operation of the farm with the predominant purpose of making a profit. See Engdahl v. Commissioner,supra;Churchman v. Commissioner,supra at 701. Petitioners advance three arguments under section 183. First, they assert that the farming activity itself was engaged in for profit despite the losses incurred during the years in issue. Second, they argue that the farming activity must be viewed as profitable when real estate tax savings resulting from its operation are considered. Third, they contend that the combination of the farming operation and the holding of the land for its appreciation in value constituted a single activity engaged in for profit. Petitioners' initial argument is that an analysis of the relevant factors enumerated in section 1.183-2(b), Income Tax Regs., leads to the conclusion that the farming activity itself was engaged in for profit. Respondent, pointing to the same factors, asserts that the operation was not entered into or continued for profit. We believe that the record considered as a whole reveals that petitioners' farming operation *529 was not profit motivated. An analysis of the relevant factors as applied to petitioners' farming operation follows. Factor (1): Manner in Which the Taxpayer Carries on the Activity.
Section 1.183-2(b)(1), Income Tax Regs., provides in pertinent part: The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. * * * Petitioners contend that accurate records of farm operations were maintained as evidenced by a chart and graph drawn up by Mr. Hambleton which plot the income and expenses of the operation. We note, however, that these records were created by petitioners in 1976 after an audit of their 1973 and 1974 returns had already begun Until that time petitioners merely kept the sales and purchase receipts relating to the farming activity together in a storage box. Additionally, there were no separate bank accounts for the farm activities and petitioners did not issue W-2 Forms or *530 keep any payroll records regarding the caretakers they hired. Thus, we are unable to conclude that petitioners maintained accurate books and records. Factor (2): Expertise of the Taxpayer or His Advisors.
Section 1.183-2(b)(2), Income Tax Regs., provides in relevant part as follows: Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * * Although petitioners had lived on farms as children neither had any professional experience in farming. They did not consult with the county agricultural agent prior to their purchase of the New Jersey property. However, subsequently they did consult with the agent and had soil classification tests performed by the Department of Agricultural Conservation, pursuant to the agent's suggestion. Petitioners did not discuss their planned cattle breeding operation with the local agent efore purchasing six heifers in 1973. However, they did consult with neighboring farmers and attended several cattle meetings. Factor *531 (3): Time and Effort Expended by the Taxpayer in Carrying on the Activity.
Section 1.183-2(b)(3), Income Tax Regs., provides: The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. Petitioner's employment transfer to Washington, D.C., made it impossible for him to devote any time to his farm-other than on weekends, holidays and vacations. Yet on his weekend visits he worked diligently at clearing the fields, harvesting hay, and mending fences and buildings. Petitioner hired a caretaker to attend to the property in his absence on a part-time basis. The employment of an experienced farmer would be a factor pointing to an operation engaged *532 in for profit. See Smith v. Commissioner,9 T.C. 1150 (1947). However, the caretakers hired by petitioners (Messrs. Vilade and Gleason) held outside full-time jobs and had no particular expertise in farming. In fact, it was not necessary that they have such expertise as many of their duties involved general maintenance rather than farming. Factor (4): Expectation That Assets Used in Activity May Appreciate in Value.
Undoubtedly petitioners intended to realize a profit from appreciation of the farm property. However, in view of the fact that our current discussion relates to the farming undertaking separate from the holding of the land for its appreciation in value, a discussion of this factor appears later in this opinion. Factor (5): Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities.
Section 1.183-2(b)(5), Income Tax Regs, states as follows: The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Petitioners have not engaged in any similar farming activities *533 in the past. Factor (6): Taxpayer's History of Income or Losses with Respect to the Activity.
Section 1.183-2(b)(6), Income Tax Regs., provides in pertinent part: A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.However where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. * * * Petitioners argue that the 8 years of losses (1970-1977) represented a lengthy start-up period which was followed by a profit in 1978. They contend that the primary reason for the lengthy start-up period was petitioner George B. E. Hambleton's *534 unexpected employment transfer to Washington, D.C. Yet this contention merely begs the precise question that confronts us; that is, petitioner's motive for continuing the farming operation in light of the foreseeable fact that petitioner's transfer to Washington, D.C., was to span at least a few years. Petitioners, when posed with the problem of Mr. Hambleton's transfer, could have decided to operate the farm only upon their return to New Jersey. The level of farm activity for the years in issue as represented by gross income figures are as follows: 1971
1972
1973
1974
Sales of Hay
$ 574
$ 595
$ 945
$ 1,120
Rent of Pasture
109
115
143
143
This level of farm activity, coupled with the fact that petitioners had significant sources of other income and that the New Jersey property offered a pleasant recreational environment fail to support the conclusion that petitioners journeyed almost every weekend from Washington to New Jersey for the purpose of eventually realizing a profit from the farming operation. Factor (7): Amount of Occasional Profits, if any, Which Are Earned.
Section 1.183-2(b)(7), Income Tax Regs., provides in relevant part as follows: The amount of profits in relation to the amount *535 of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. * * * Petitioners purchased the 110 acre farm in 1970 for $ 230,000.The farm operation sustained considerable losses during the 8-year period 1970-1977. The losses reported on their Schedule F for those years total $ 43,315.88. This total does not include amounts expended for real estate taxes or interest as those amounts were deducted as itemized deduction on Schedule A for each year. In 1978, petitioners reported a profit of $ 1,347.00 on Schedule F. This profit resulted mainly from sales of a portion of their breeding herd and farm equipment and from the most rigorous control of expenses exercised by petitioners since the inception of their farm operation. Considering the large investment petitioners made in the farm and the source of the net profit in the 9th year *536 of operation we are unable to accord the existence of this small profit in 1978 more than minimal weight in our evaluation of whether the farming activity was engaged in for profit in the years 1971-1974. Factor (8): Financial Status of the Taxpayer.
Section 1.183-2(b)(8), Income Tax Regs., provides: The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. For the years in issue petitioners reported the following amounts of wages, dividends, and other income: 1971
1972
1973
1974
Wages
$ 22,826.21
$ 24,102.00
$ 24,529.00
$ 25,329.00
Dividends
15,414.09
15,712.00
17,620.00
21,344.00
Taxable Interest
679.13
4.00
391.00
0
Net Capital Gains
36,369.58
8,788.00
23,831.00
164,243.00
Rent/Royalties
26.13
3.00
31.00
6.00
Income from Estate
4,752.00
Total
$ 75,315.14
$ 48,609.00
$ 66,402.00
$ 215,674.00 Given these significant amounts of income from sources *537 unrelated to their farm operation we are unable to find that petitioners were even inconvenienced by the farm losses. Rather, their farm losses served to offset substantial amounts of their other income for tax purposes. Factor (9): Elements of Personal Pleasure or Recreation.
Section 1.183-2(b)(9), Income Tax Regs., provides in pertinent part as follows: The presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. * * * An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged *538 in for profit as evidenced by other factors whether or not listed in this paragraph. Enjoyment of the farm and its recreational aspects were contributing factors in petitioners' decision to visit the property almost every weekend. The property was equipped with a swimming pool and petitioners maintained five Shetland ponies on the farm. The record indicates that petitioners' daughter was especially interested in equestrian pursuits. Further, petitioners were both raised on farms and viewed the prospect of returning to a rural environment as inviting. Petitioners' enjoyment of the farm environment itself is not inconsistent with a profit motive for the farm operation. However, we believe that when viewed together with the economic output on the farm along with the effort expended by petitioners in getting to the property from Washington, D.C. and attending to it, it appears that the enjoyment of being at the property and attending to it was more important to petitioners than the potential of supplementing their other income by realizing a profit from the farm operation. In summary, while there are several factors which might indicate a profit objective for the operation of the *539 farm (e.g., consultation with the county agricultural agent and area farmers and the time and effort expended on the farm by petitioners), we hold that the totality of circumstances relating to the operation of the farm requires the conclusion that the activity was not engaged in for profit. Petitioners' second argument is that actual profits resulted from the farm operation during the years in issue if the New Jersey property tax savings are taken into account. Petitioners compute this "profit" as follows: Estimated
Assessed
Property
Full and
Value as
Tax on
Actual Farm
Tax
Year
Fair Value
Farmland
Full Value -Tax Paid
= Savings
1971
$ 216,750
$ 7,900
$ 6,412
$ 221
$ 6,191
1972
270,000
8,500
7,639
254
7,385
1973
326,000
12,500
9,408
426
8,982
1974
382,000
11,000
11,361
275
11,086
Petitioners then add the tax savings figure to their farm cash income and subtract their farm cash expenses. [15]
Property
Cash Profit
Tax
Farm Cash
Farm Cash
Derived from
Year
Savings
+ Income
- Expenses
= Farm Operation
1971
$ 6,191
$ 683
$ 3,197
$ 3,677
1972
7,385
710
3,303
4,792
1973
8,892
1,126
7,069
2,949
1974
11,086
1,289
4,362
8,013
Total
$ 33,554
$ 3,808
$ 17,931
$ 19,431
The resulting *540 figure for each year, petitioners claim, represents the "actual cash profit" from the farm operation for each of the years in issue. Although these mathematical gyrations are alluring, their deceptiveness is revealed upon analysis. As respondent correctly points out, cost savings (i.e., property tax reductions) do not constitute an additional source of revenue. A reduction in the costs of doing business does not constitute revenue received, otherwise a business could make a profit solely by reducing its costs even if it generated no income. The profits or deficits of the farm operation or any other business are computed by using the actual costs which automatically take into account cost reductions. The best that can be said for petitioners' argument is that the farm losses would have been significantly larger had the benefits of farmland assessment not been available. Petitioners' third argument under section 183 is that their farming operation together with the holding of the land for its appreciation in value constituted a single activity engaged in for profit. We have found that petitioners purchased and held the land principally as an investment. In fact, the property increased *541 in value from approximately $ 216,000 in 1970 to almost $ 400,000 at the end of the years in issue.We must here decide whether the holding of the land for its appreciation in value may be combined with the farming operation so as to constitute a single activity engaged in for profit. In our discussion of petitioners' contention that the farm operation itself was engaged in for profit we reserved our discussion of the following factor which appears in section 1.183-2(b)(4), Income Tax Regs.
(4) Expectation that assets used in activity may appreciate in value. The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation in land will exceed expenses of operation. See,however, paragraph (d) of § 1.183-1 for definition of an activity in this connection. [Emphasis added] According to the cross-referenced section 1.183-1(d)(1), Income Tax Regs., *542 the holding of land primarily for its appreciation in value and a farming activity may, under certain circumstances, be considered a single activity for purposes of section 183.
(d) Activity defined--(1) Ascertainment of activity. In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the agree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity *543 or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property *544 taxes attributable to the land and improvements, and depreciation of improvements to the land). [Emphasis added.] The regulation provides that farming and the holding of the land as an investment will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. It is undisputed that for the years in issue the expenses (apart from depreciation of improvements) directly attributable to the farming activity substantially exceeded the farm income. Year
Farm-Gross Income
Farm Expenses
1971
$ 683.00
$ 3,197.45
1972
710.00
3,303.00
1973
3,526.00
9,469.00
1974
4,049.00
7,122.00
Thus, petitioners do not satisfy the test set forth in section 1.183-1(d) for combining their farming activity with their primary investment motive into a single profit-motivated activity. The regulation is presumptively valid and must be sustained unless it is found to be unreasonable or plainly inconsistent with the revenue statutes. Commissioner v. South Texas Lumber Co.,333 U.S. 496, 501 (1948). Petitioner apparently does not directly challenge the validity of the regulation. Petitioners argue, however, that the required organizational and *545 economic interrelationship exists between the undertakings in that the farming operation resulted in reduced real estate taxes. Thus, their argument continues, the test found in the regulations is met (i.e., does the farming activity reduce the net cost of carrying the land?) if the real estate tax savings are entered into the computation. Unfortunately for petitioner the language of the regulation is clear and we must reject this variation of petitioner's last argument that a reduction in tax is equivalent to a receipt of income. The profit referred to in the regulation is a profit on the operation itself (receipts in excess of expenditures) rather than an economic gain realized through a tax reduction or savings. While it is questionable whether petitioners would have engaged in the farming activity at all were it not for the economic benefit derived from the reduction in real estate taxes, we note that it was not necessary for them to do so. Rather, the benefits of farmland assessment were available by merely leasing the property to a farmer who produced the required gross receipts. Thus, it was possible to reduce their property tax without incurring any farm expenses. In *546 summary, we conclude that petitioners never had the objective of realizing a profit from farming during the years in issue separate and apart from the tax benefits they hoped to derive therefrom. [16] In addition, the farming activity together with holding the land primarily for investment does not constitute a single activity entered into for profit within the meaning of section 1.183-1(d), Income Tax Regs.
The final issue for our decision is whether petitioners may deduct any of the disallowed farm expense deductions as ordinary and necessary expenses incurred with respect to property held for investment. Petitioners argue that some or all of these expenses are properly allocable to the holding of the property for investment and, therefore, are deductible under section 212(2). Section 1.183-1(d)(2), Income Tax Regs., specifically addresses the allocation issue: (2) Rules for allocation of expenses. If the taxpayer *547 is engaged in more than one activity, an item of deduction or income may be allocated between two or more of these activities. Where property is used in several activities, and one or more of such activities is determined not to be engaged in for profit, deductions relating to such property must be allocated between the various activities on a reasonable and consistently applied basis. Where property is held for the purpose of realizing a gain on its disposition, ordinary and necessary expenses attributable to the management, conservation or maintenance of the property are deductible under section 212(2). Section 1.212-1(d), Income Tax Regs. The question is one of fact and petitioners again bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
It is obvious from the record that the investment potential of the property was for development as a residential subdivision. Petitioners paid $ 230,000 for a 110 acre parcel of land that was worth $ 100 to $ 500 per acre as farmland and seven or eight times as much if used for residential purposes. During the years in issue its assessed value as farmland ranged from a low of $ 7,900 to a high of only $ 12,500. *548 The land is situated in an area within commuting distance from New York City and is in the process of changing from an agricultural region to a residential area. Petitioners certainly do not contend that they expected to profit from an increase in its value as a farm. The deductions disallowed by respondent were for expenses incurred for such items as feed, fertilizer, veterinarian services, utilities, gasoline and labor. Petitioners have not explained how any of these items are ordinary and necessary to the holding of the property as an investment. To the extent that any of these expenses were attributable to the house which was used by petitioners as a second residence, they are clearly nondeductible. Section 262. [17] The remainder of the expenses were incurred to carry on a farming activity which was not engaged in for profit. We are unable to find the required relationship of these expenses to the holding of the property for future sale as a residential development. Thus, petitioners have not established that the disallowed expenditures were ordinary and necessary to the management, conservation or maintenance of the investment property so as to allow deductibility under *549 section 212(2). [18] See Riss v. Commissioner,56 T.C. 388 422 (1971). Decision will be entered for respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended, and in effect during the years at issue.
2. The relevant portions of the New Jersey Farmland Assessment Act provide: 54:4-23.1 Short title This act shall be known and referred to by its short title, the "Farmland Assessment Act of 1964." 54:4-23.2 Value of land actively devoted to agricultural or horticultural use For general property tax purposes, the value of land, not less than 5 acres in area, which is actively devoted to agricultural or horticultural use and which has been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, on application of the owner, and approval thereof as hereinafter provided, be that value which such land has for agricultural or horticultural use. 54:4-23.3 Land deemed in agricultural use Land shall be deemed to be in agricultural use when devoted to the production for sale of plants and animals useful to man, including but not limited to: forages and sod crops; grains and feed crops; dairy animals and dairy products; poultry and poultry products; live-stock, including beef cattle, sheep, swine, horses, ponies, mules or goats, including the breeding and grazing of any or all of such animals; bees and apiary products; fur animals; trees and forest products; or when devoted to and meeting the requirements and qualifications for payments or other compensation pursuant to a soil conservation program under an agreement with an agency of the Federal Government. 54:4-23.4 Land deemed in horticultural use Land shall be deemed to be in horticultural use when devoted to the production for sale of fruits of all kinds, including grapes, nuts and berries; vegetables; nursery, floral, ornamental and greenhouse products; or when devoted to and meeting the requirements and qualifications for payments or other compensation pursuant to a soil conservation program under an agreement with an agency of the Federal Government. 54:4-23.5 Land deemed actively devoted to agricultural or horticultural use Land, five acres in area, shall be deemed to be actively devoted to agricultural or horticultural use when the gross sales of agricultural or horticultural products produced thereon together with any payments received under a soil conservation program have averaged at least $ 500.00 per year during the 2-year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to at least $ 500.00 within a reasonable period of time. In addition, where the land is more than five acres in area, it shall be deemed to be actively devoted to agricultural or horticultural use when the gross sales of agricultural or horticultural products produced on the area above five acres together with any payments received under a soil conservation program have averaged at least $ 5.00 per acre per year during the 2-year period immediately preceding the tax year in issue, or there is clear evidence of anticipated yearly gross sales and such payments amounting to an average of at least $ 5.00 per year within a reasonable period of time; except in the case of woodland and wetland, where the minimum requirement shall be an average of $ 0.50 per acre on the area above five acres. Land previously qualified as actively devoted to agricultural or horticultural use under the act; but failing to meet the additional requirement on acreage above five acres shall not be subject to the roll-back tax because of such disqualification, but shall be treated as land for which an annual application has not been submitted. 54:4-23.6 Qualifications for valuation, assessment and taxation as land actively devoted to agricultural or horticultural use Land which is actively devoted to agricultural or horticultural use shall be eligible for valuation, assessment and taxation as herein provided when it meets the following qualifications: (a) It has been so devoted for at least the 2 successive years immediately preceding the tax year for which valuation under this act is requested; (b) The area of such land is not less than 5 acres when measured in accordance with the provisions of section 11 hereof; and (c) Application by the owner of such land for valuation hereunder is submitted on or before August 1 of the year immediately preceding the tax year to the assessor of the taxing district in which such land is situated on the form prescribed by the Director of the Division of Taxation.↩
*. The approximate fair market value figures for the years in issue are derived from the testimony of Max E. Spann, petitioners' real estate appraisal expert.↩
3. Petitioner acquired six heifers in 1973 and in 1975 purchased a bull for $ 500. No cattle was sold during the years at issue. In 1976, 1977, and 1978, petitioner received proceeds of $ 1,000, $ 1,905, and $ 3,694, respectively, from cattle sales. The profit margin of a breeding operation of the type engaged in by petitioners amounts to approximately $ 100 per animal sold. Petitioners' 110 acres are made up of 46 acres of woodland, 38 acres of permanent pasture, 7 acres of pastured cropland, 18 acres of cropland available for cultivation and 1 acre upon which petitioners' farmhouse stood. Between 20 and 35 cattle could be maintained on this acreage depending on the quality of the pasture, the productivity of the fields and whether feed was purchased from an outside source. Petitioners owned 22 head of cattle as of December 31, 1977. Between 1971 and 1978 petitioners incurred losses on their farm totalling in excess of $ 41,000. With a breeding operation such as petitioners, which averages only 20 head of cattle, it could take up to 40 years to recoup these losses.↩
4. These expense figures do not include real estate taxes or interest expense as those amounts were deducted by petitioners as itemized deductions in each year. ↩
5. The depreciation deductions related to the more than $ 25,000 of improvements and equipment purchased by petitioners. ↩
6. Petitioners' 1978 profit was due largely to the sale of a portion of their breeding herd (including their bull) as well as a sale of farm equipment. Additionally, the claimed expenditures for 1978 were the lowest yearly expenses shown on petitioners' returns since 1972.↩
7. Petitioners' records of these sales consist of copies of purchasers' checks and sales receipts.↩
8. These dividends represent the earnings of a trust created by Mr. Hambleton by deed of trust dated September 13, 1963.↩
9. The 1974 capital gain is attributable to the sale of petitioners' inherited one-eighth interest in a farm located in Baltimore County, Maryland. Petitioner, in light of recurrent losses from the New Jersey farm, used the proceeds of the 1974 sale to satisfy the $ 170,000 mortgage on that property.↩
10. Section 183(d) and (e) provides in relevant part as follows: (d) Presumption.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary or his delegate establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. * * * (e) Special Rule.-- (1) In general.--A determination as to whether the presumption provided by subsection (d) applies with respect to any activity shall, if the taxpayer so elects, not be made before the close of the fourth taxable year * * * following the taxable year in which the taxpayer first engages in the activity. * * *
11. In the notice of deficiency respondent has accounted for $ 21 of recaptured investment credit reported on petitioner's 1972 return.↩
12. Section 183(a) through (c) provides as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 13. Section 162(a) provides in pertinent part: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. ↩
14. Section 212(1) and (2) provide: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income.↩
15. Petitioners omit from their computation the barter arrangement with the caretaker.↩
16. The law is clear that a motive to effect a reduction in tax is not a "profit" motive because it is not intended to produce taxable income. Yanow v. Commissioner,44 T.C. 444 (1965), affd. 358 F.2d 743 (3rd Cir. 1966). See also McNamara v. Commissioner,T.C. Memo. 1973-3↩.
17. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses. ↩
18. Because we have found that petitioners were not in the trade or business of farming we also must sustain respondent's disallowance of claimed investment tax credits for property used in their farming activity. Section 1.48-1(b)(2), Income Tax Regs.↩ The disallowance of the claimed farm losses also necessitates an automatic adjustment to petitioner's claimed medical deduction. Section 213.